**CHARLES F. CURRY AND COMPANY,**
a Corporation, Appellant,

v.

**Wyatt C. HEDRICK, Respondent.**

No. 49658.

Supreme Court of Missouri,

Division No. 2.

May 1, 1964.

David R. Hardy, Frank P. Sebree, James H. Ottman, Mari W. Privette, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Wilbur L. Pollard, Williams, Norton & Pollard, North Kansas City, for appellant.

Arthur R. Kincaid, William B. Waters, Robert E. Coleberd, Hale, Coleberd, Kincaid & Waters, Liberty, Howard M. Fender, Austin, Tex., for respondent.

BOHLING, Special Commissioner.

█ This is an action for damages instituted by Charles F. Curry and Company, a Missouri corporation, against Wyatt C. Hedrick of Fort Worth, Texas, arising out of the sale of a Lockheed Lodestar twin engine airplane (Identification mark N 555 H) to plaintiff. Service was by attachment, which was released when defendant entered his appearance. The airplane was officially "grounded" as unairworthy by the Federal Aviation Agency (hereinafter referred to as FAA) about seven months after its purchase. It was later returned to defendant by plaintiff for correction of the discrepancies, which corrections defendant allegedly agreed to make without costs to plaintiff. The making of the corrections deprived plaintiff of the use of said airplane. Defendant, learning plaintiff was asserting a claim for said loss of use, refused, under circumstances hereinafter narrated, to surrender said airplane to plaintiff. The action went to trial on plaintiff's first amended petition, which was in three counts. At the close of the evidence plaintiff's Count II, in the alternative for breaches of implied warranties for loss of use of the airplane, was dismissed. Defendant's counterclaim to recover his costs ($13,815.58) in making the plane airworthy was also dismissed. They need not be developed. Count I of plaintiff's petition, for the loss of use of said airplane, was based upon alleged breaches of certain express warranties. Count III was trover for alleged conversion. Defendant's answer to Count I, so far as need be noted, denied the material allegations of plaintiff's petition. Defendant's answer to Count III, briefly stated, alleged defendant undertook the repair of the airplane as a pure accommodation; that plaintiff concealed his intention to make a claim for loss of use; that when plaintiff presented such claim, defendant refused to deliver said airplane until he was paid the reasonable value of his services, $13,815.58; and that, upon plaintiff's refusal to pay, defendant retained possession of the airplane under the Mechanics Lien Law of the State of Texas. Plaintiff's reply was in effect a denial of all affirmative matter pleaded by defendant, alleging defendant's answer failed to state a defense to plaintiff's petition. Defendant's separate motions for a directed verdict on Count I and on Count III, and to dismiss plaintiff's claim for punitive damages were overruled. The jury returned a verdict for defendant on Count I, signed by ten jurors, and a verdict for defendant on Count III, signed by nine jurors. We have appellate jurisdiction as plaintiff asked actual damages of approximately $115,000 and punitive damages of $100,000. Plaintiff questions rulings of the trial court with respect to the submission of issues to the jury, the refusal and giving of instructions, and the admission and exclusion of evidence.

The Federal Aviation Agency Act, applicable to this Lodestar, broadly stated, authorizes, in the interests of safety, the Administrator therein created to establish minimum standards governing the design, materials, workmanship, construction and performance of certain aircraft and their appliances, and reasonable rules and regulations and minimum standards for their inspection and certification as airworthy or unairworthy. 49 U.S.C.A. § 1421. It is unlawful, for instance, to operate such aircraft without a current certificate of airworthiness in effect, or in violation of any rule, regulation or certificate issued under said authority. Id., § 1430.

The Code of Federal Regulations (CFR), Title 14 CFR, Aeronautics and Space, § 18.11 prohibits the return to service of any airframe, powerplant, propeller, or appliance subjected to major repair or alteration before the same has been examined, inspected and approved as airworthy by an authorized representative of the FAA.

Records of every maintenance, repair, rebuilding or alteration of any airframe, powerplant, propeller or appliance are to be maintained in a logbook or other permanent record by the owner. Id., § 18.20.

Forms ACA–337, supplied by the Federal Administrator and known as Forms 337 in the record, approving a major repair or alteration are to be executed in duplicate. The original is given to the aircraft owner for his permanent record and a copy is retained by the FAA. Id., §§ 18.22, 18.22–1.

These aircraft and engine maintenance records are to be transferred to the new registered owner upon disposition of the aircraft or engine involved. Id., § 43.23.

One logbook for each engine and a logbook for the airframe are to be kept on twin engine planes. The FAA regulations make provision for 100-hour inspections and for periodic or annual inspections, and require that airplanes, for their continuation in service, be certified airworthy at the periodic or annual inspection, with a copy of the certificate forwarded to the FAA.

Charles E. Curry, herein referred to as Mr. Curry, is president and managing officer of Charles F. Curry and Company, plaintiff, which is engaged in the real estate loan business in Missouri, Kansas, Oklahoma and Arkansas. Charles F. Curry, father of Charles E., is also interested in said business. All negotiations in this litigation on behalf of plaintiff were conducted by Mr. Curry.

Defendant is primarily engaged in the architectural and engineering business. He is also interested in ranching, real estate and insurance. He or his companies have owned airplanes since 1923 and many planes since 1945. He maintains an "Aviation Division" at Meacham Field, Fort Worth, Texas. He is not a licensed pilot, has no substantial mechanical knowledge of airplanes, but has flown planes under the supervision of licensed pilots.

In 1960, Tom Stanley, a former business associate of defendant, and George Mulkey, defendant's office manager, described by defendant as his man "Friday," informed Mr. Curry of the availability at $125,000 of defendant's Lodestar airplane. By long distance telephone calls to Fort Worth on Saturday, February 6, 1960, Mr. Mulkey was informed plaintiff would be interested in purchasing the Lodestar at $90,000 subject to approval after an inspection and flight and an overhaul of the engines. This resulted in arrangements for Marvin Jenkins, pilot and public relations man for defendant, and Jack Keefauver, co-pilot for defendant, to meet and fly Mr. Curry in the Lodestar from Albuquerque, New Mexico, to Kansas City on Sunday, the 7th. On this trip Mr. Jenkins told Mr. Curry the Lodestar was an excellent plane and pointed out work done on it for defendant, stating this made the plane very desirable.

Mr. Curry arranged for Ed Frazier, plaintiff's pilot, to look at the airplane and report to him, and on Monday, February 8th, Mr. Frazier examined the entries in the Lodestar's logbook and was taken by defendant's pilots for a flight in the plane. Mr. Frazier reported to Mr. Curry that a periodic certification of September, 1959, in the logbook stated the airplane was "airworthy," and that the plane looked like a fine executive type airplane. Said certification of airworthiness was signed by Earl G. King, Jr., then in the employ of defendant, a fact not known to plaintiff.

Count I of plaintiff's petition was submitted on the theory defendant was liable for making one or more of the following untrue express warranties to induce plaintiff to purchase the aircraft, and that plaintiff relied thereon in purchasing the airplane, to-wit, that said Lodestar airplane was "A–1 in every respect," or was "in first class condition," or was "airworthy."

Mr. Curry and his father, following Mr. Frazier's report, talked with defendant over long distance telephone on February 8th. Mr. Curry's father did not testify at the

trial. Mr. Curry testified that in said conversation defendant represented to him and his father that this Lodestar airplane "was in A-1 condition"; was "first class in every respect"; "was ready to fly now"; and "was as good a plane as money could buy."

Defendant, a witness in his own behalf, testified that said telephone conversation was the only conversation he had with Mr. Curry concerning the sale of this aircraft to plaintiff; that theretofore he had never offered the Lodestar for less than $125,000; that he first asked Mr. Curry $100,000; that Mr. Curry offered $90,000; that while he was asking $100,000 and Mr. Curry was bidding $90,000: "Q * * * [Y]ou represented to Mr. Curry that this plane was airworthy in every respect, did you not? A Yes, sir. Q And you represented to Mr. Curry that it was properly licensed with the FAA? A Yes, sir. Q And you represented to Mr. Curry that this plane was in first class condition, did you not? A Yes, sir. Q And that it was A-1 in every respect? A I'm sure that I did, sir, yes."

Defendant, under date of February 9, 1960, wrote plaintiff, outlining the terms of their agreement and stated, in part: "In conclusion, we would like to say that we have found this plane A-1 in every respect, for operational purposes, and as I told both you and your father, I believe you have as good a plane as money can buy and, I think, at an economical price."

The parties agreed that plaintiff would pay $90,000 for the airplane; $80,000 cash and later $10,000 upon defendant overhauling the engines. This purchase price was timely paid.

Mr. Curry was not a licensed pilot and knew little about Lodestar airplanes. Mr. Frazier, plaintiff's pilot, was not licensed to fly Lodestar aircraft at the time of the purchase, which fact was known to defendant's pilots. Plaintiff employed Ernie Blagg of Dallas as temporary pilot of the Lodestar. Mr. Frazier was licensed as a Lodestar pilot July 25, 1960.

Mr. Curry testified a prior purchase of an airplane from defendant had proved satisfactory, and he relied upon defendant's statements in purchasing this Lodestar.

The Lodestar was due for a periodic inspection and certification in September, 1960. It had been flown by plaintiff for 225 hours and had had 100-hour inspections, which did not require it to be certificated as airworthy. On September 6th, Mr. Frazier flew the plane to Gopher Aviation, Inc., Rochester, Minnesota, for a 100-hour and a periodic inspection for certification as airworthy. The Gopher company was a certified station for the inspection, repair and certification of aircraft, and previously had performed work for plaintiff.

The Lodestar, upon inspection, was found unairworthy by the Gopher company. This finding was confirmed by a representative of the FAA office in Minneapolis, who found additional items of unairworthiness. The Lodestar was officially grounded as unairworthy September 29, 1960.

Defendant, in March, 1955, had purchased this Lodestar after the manager of his Aviation Division, E. H. Bradley, an experienced airplane service and maintenance man, inspected the plane and recommended its purchase. This aircraft was not in condition for commercial use and by April, 1956, it had been completely overhauled, defendant testified "rebuilt from A to Z," under Bradley's supervision to convert it to executive use for defendant.

A certification, dated February 17, 1954, at the front of the Lodestar's Aircraft Log stated that "previous logbooks for this aircraft" have been stolen. Subsequent certificates of airworthiness during defendant's ownership following periodic inspections appear in the Lodestar's logbook under the dates shown by the following inspectors: 4-18-56, and 6-29-57, J. F. Powers; 7-30-58, W. H. McDaniel, and 9-16-59, Earl G. King, Jr.

Among the more important discrepancies for grounding the Lodestar were, as we

read this record: Defendant had installed a Janitrol gasoline fired heater, which was considered unsafe because of the absence of drip pans or scuppers should a leak develop; had installed his type of radio equipment in the nose of the plane, the radio rack of which was unairworthy; and had installed seats and picture windows in the cabin. He substituted shorter for the regular longer exhaust stacks on each engine, with the rear attachments inadequate for proper support. He changed the landing emergency gear so as to require the pilot or co-pilot to leave his seat, go back and open a cover to operate it. Additional modifications of the original aircraft were made.

Forms 337, which should have been executed in duplicate, issued and properly filed approving these and other changes, were not to be found. Plaintiff's pilot Frazier was informed and he informed defendant's pilot Jenkins. Plaintiff and defendant endeavored to locate Forms 337. We understand the only Forms 337 found was one with the FAA approving the picture windows and perhaps one for the "flush loops."

Mr. Curry telephoned defendant September 27, 1960, that the airplane was being grounded because of the improper handling of alterations with the FAA prior to plaintiff's purchase, and that certain discrepancies were defendant's responsibility. Defendant's witness Jenkins testified this conversation was heated at times.

Mr. Curry's testimony with respect to the agreement between plaintiff and defendant accords with defendant's version.

Defendant testified in chief he told Mr. Curry that if the irregularities were in any way his responsibility, he would put the airplane in shape for FAA certification without charge, for plaintiff to send the plane to Fort Worth, and that Mr. Curry said nothing about any intention to make a claim for loss of use of the airplane. He testified on cross-examination: "I agreed to put it [the Lodestar] in necessary condition for it to be certified by the FAA Q Right. A We always thought it was airworthy, sir. Q * * * Now, Mr. Curry agreed, did he not, in that conversation and by subsequent correspondence, that if there was any wear and tear and maintenance work that needed to be done that he would pay for that upon notification and his authorization in writing, isn't that correct? A I don't know whether he said that in his conversation but he wrote a letter to that effect, sir. Q Yes. And you agreed to that, didn't you? A I did. Q All right. And Mr. Curry also agreed to fly the plane down from, or ferry it down from Gopher so that your work in putting it in FAA certified condition would not be as expensive as if it were done at Gopher, isn't that correct? A That is correct. Q Now, that was all of the agreement that you had with Mr. Curry, wasn't it? A Yes, sir." There was corroborating evidence from some of defendant's witnesses.

Mr. Frazier flew the plane to defendant's Aviation Division on October 3rd under a FAA special ferry permit.

We note the more important matters mentioned in the correspondence between the parties.

Defendant wrote, October 5, 1960, that maintenance work due to wear and tear after the plane left his possession should be met by plaintiff; and asked plaintiff for written authorization to proceed.

Mr. Curry wrote, October 6th, asking with respect to possible charges against plaintiff that defendant, as he had offered to do, advise by letter what such charges would be before plaintiff authorized any specific work, stating plaintiff was willing to pay for any normal wear and tear items; that the loss of use of the plane was a critical item; and, among other things, as had been discussed by telephone, asked again "that before any cost is incurred to be borne by us that you inform us what the amount and nature of the expenditure will be, and we will immediately reply to

you on the matter. Subject to these points" plaintiff authorized defendant to proceed with the work.

Defendant answered October 7th, in part: "Let me conclude this letter by saying we will do nothing that will cost you money, without notifying you by wire or letter. We will do it with the utmost speed. * * Mr. Jenkins will contact your Mr. Frazier *for a direct wire or letter over your signature on anything we find on which we think you should bear all or any part of the costs.*" (Emphasis added.) He also stated he was fully aware of the time loss involved in getting this plane back into the air.

Defendant, in a deposition read in evidence, testified that the foregoing quotation stated his "position entirely and completely," and: "Q * * * Now, let me ask you: Have you at any time from October 7, 1960, received or requested a direct wire or letter over Mr. Curry's signature authorizing you to incur any cost at the expense of the Charles F. Curry Company? A No."

Mr. Curry, November 14th, "attention" Mr. Jenkins, wrote that the plane had been grounded since September 7th; that this was a considerable loss to plaintiff, inquired as to the probable date of its return to service, and mentioned defendant's assurances no costs would be incurred against plaintiff without notifying plaintiff.

Mr. Jenkins, answering November 15th, stated defendant realized the loss of the plane was costly to plaintiff; that defendant was turning away profitable work; that a completion date could not be reliably estimated; that his understanding was that upon completion of the work Mr. Frazier and he would work out the items to be treated as maintenance, and they would proceed on that basis "if we do not hear from you."

This brought a telegram, November 16th, from Mr. Curry that plaintiff saw no basis for changing the understanding from defendant's letter of October 7th; and Mr.

Sebree, plaintiff's attorney, November 21st, wrote Mr. Jenkins that plaintiff was proceeding in accordance with defendant's letter of October 7th; wanted defendant to abide by the original understanding and to bill plaintiff only for items which Mr. Curry authorized in advance; and that unauthorized charges were at Mr. Curry's discretion.

Defendant, Mr. Jenkins writing, November 23rd, acknowledged receipt of Mr. Sebree's letter and expressed the thought that upon completion of the work all matters would be amicably settled.

Mr. Jenkins, December 2nd, wrote Mr. Frazier about not obtaining approval of a couch, stating he was hopeful of having the situation made acceptable by adjusting certain safety belts and other work, and that since this work was necessary because of what had been done after plaintiff's purchase, plaintiff should bear the costs. Mr. Sebree, December 6th, answered stating Mr. Curry would assume liability for any work on the couch necessitated by modifications after his possession of the plane, but defendant was "to itemize carefully such work"; that Mr. Curry did not understand how making the back and arm rests of the couch removable could bear on the position of the seat belts; that unauthorized maintenance items rested in Mr. Curry's discretion; and that upon FAA certification several things would have to be resolved, including, among others, plaintiff's loss of use of the airplane.

Jack Keefauver succeeded E. H. Bradley as manager of defendant's Aviation Division in February, 1960. He testified at length, stating in part: 56 discrepancies were listed and that 7 were resolved, mistakes that should not have been listed; that some discrepancies arose during plaintiff's possession of the plane; that on some discrepancies he merely obtained approval for the installation that was already there; that is, a FAA Form 337. The witness, however, testified work was done on the heater and the heater installation was approved as

it existed. If he corrected the discrepancies listed under "Heater Installation," he, among other things, remedied the absence of scuppers which tended to make this installation unsafe. He testified he, among other things, replaced the short exhaust stacks with the original longer exhaust stacks on the engines; installed a different emergency gear extension system, and built a new radio. These items, among others, are traceable to alterations of the plane by defendant in 1955 and 1956; and are among the discrepancies shown to have been "repaired," "corrected," or "complied with" on a list witness Keefauver attached to the logbook. All Forms 337 on said list and obtained by defendant in making the plane airworthy are dated December 20, 1960.

Mr. Frazier went to Fort Worth December 21st to test fly the airplane. After the flight Mr. Jenkins told Frazier, having been instructed to do so by defendant, that when he returned for the plane to bring a release from all liability for defendant and a written apology for the letters Mr. Curry's lawyer had written to him, Jenkins; stating otherwise defendant would let the airplane "sit there till the damn wings fell off" before he would release it. This was the first intimation plaintiff had that defendant was attaching conditions to his surrender of the Lodestar after FAA certificated it.

Defendant telegraphed plaintiff December 23, 1960, as follows: "Lodestar 555H certificated 3 PM this date. Awaiting your disposition subject to letter following."

The plane had been grounded for approximately three months.

The "letter following," also dated December 23rd, confirmed said telegram and stated: "It is my pleasure to tell you that when you give me a letter waiving all claims account of delays, loss of usage, and an apology for your letters through your attorney to our Mr. Jenkins, the plane is at your disposal." It also stated many things had been done to the plane "and we have done it without cost to you and it all has been paid for and borne by me."

On December 27th plaintiff telegraphed defendant that Mr. Frazier and a co-pilot would call for the Lodestar on the 28th. On the 28th, at Meacham Field, Mr. Frazier and the co-pilot asked Mr. Jenkins for but were refused delivery of the airplane because Frazier did not have the letters defendant demanded for surrendering the airplane. Mr. Frazier reported to Mr. Curry over long distance telephone. Mr. Curry telegraphed defendant on December 28th again demanding delivery of the airplane. Defendant refused to deliver the airplane to plaintiff's pilots because plaintiff had not sent the releases and the apology he had demanded. Defendant has possession of the Lodestar.

Defendant telephoned Howard M. Fender, his son-in-law and an attorney, on December 28th and told him to "take over the matter," to send a telegram withdrawing all former promises and agreements and to demand full payment. Mr. Fender testified he advised defendant, based on facts given him by defendant, that defendant could retain possession of the airplane until plaintiff paid the bill. Mr. Fender telegraphed plaintiff, expressly stating: "Re ur telegram my client Wyatt C. Hedrick Dec. 28, 1960, Lodestar was to be released no cost to you in exchange for your release. In view your demand we withdraw offer and are preparing bill for repairs to your account." The telegram also stated that the Lodestar was being held under the Texas Mechanics Lien Law, and "on payment in full" defendant would release lien and airplane.

Later, defendant submitted a bill to plaintiff for $13,815.58 for repairs to the Lodestar, which defendant testified was for work he had agreed to do at his own costs.

Defendant says the first two points in plaintiff's brief preserve nothing for appellate review. They read:

"I. Defendant was guilty of conversion as a matter of law in failing to surrender possession of the airplane to plaintiff's pilots on December 28, 1960, and, therefore, judgment on this issue should be entered in favor of plaintiff."

"II. The trial court erred in refusing to give plaintiff's requested instruction lettered 'G' which directed a verdict for plaintiff on Count III (conversion) as to liability and submitted to the jury only the issue of damages."

■ Plaintiff's Points I and II are subject to criticism in that they do not fully disclose what appellant contends the trial court did wrong and why he claims it was wrong. Civil Rule 83.05(a, 3) (e), V.A. M.R.; State ex rel. State Highway Comm. v. Warner, Mo.App., 361 S.W.2d 159, 161 [3]; Domijan v. Harp, Mo., 340 S.W.2d 728, 731 [1, 2] and citations; Ambrose v. M. F. A. Co-op. Ass'n, Mo., 266 S.W.2d 647, 650, 651. However, considering those points together, and also the instruction referred to in Point II, plaintiff's essential contentions are ascertainable.

Plaintiff's contention, reading Points I and II in the light of this record, is that defendant's evidence not only failed to establish a legal defense to plaintiff's Count III (Knisely v. Leathe, Mo., 178 S.W. 453, 461 [11]) but going farther, established defendant had no legal defense thereto and made out plaintiff's claim under Count III on the issue of liability, leaving only the issue of damages for the jury under said count. An unusual situation exists, embracing as basic an issue as whether plaintiff made a submissible case. It should be reviewed. Knisely v. Leathe, supra; Nelson v. Kansas City, 360 Mo. 143, 227 S.W.2d 672; Conser v. Atchison, T. & S. F. Ry. Co., Mo., 266 S.W.2d 587, 589 [1]; Moseley v. Searcy, Mo., 363 S.W.2d 561, 563 [2]; Pettus v. City of St. Louis, 362 Mo. 603, 242 S.W.2d 723, 728 [5]. Consult citations in preceding paragraph. Plaintiff's two points aforesaid are so interrelated that an intelligent consideration of Point I embraces, in effect, a consideration of Point II, relating to refused instruction "G."

Refused instruction "G," so far as material, read: "The Court instructs * * * with respect to Count III * * * that on December 28, 1960, defendant converted the Lodestar Airplane mentioned in evidence, and your verdict must be for plaintiff on Count III, and you shall assess actual damages on that Count in an amount which you find * * * was the fair market value of said airplane on December 28, 1960, at Fort Worth, Texas, together with interest at the rate of 6% per annum on said amount from December 28, 1960, to the present." The instruction then directs the jury on the issue of punitive damages.

■■ The law with respect to directing a verdict for the party having the burden of proof is well stated in Coleman v. Jackson County, 349 Mo. 255, 160 S.W.2d 691, 693 [2] (citations omitted):

"It is a generally accepted rule in this state that a verdict may not be directed in favor of the proponent, that is the party upon whom the law casts the final burden of proof. * * * There is, however, a well-recognized exception to the rule. If the opponent, that is the party not having the burden of proof, admits either in his pleadings or by counsel in open court or in his individual testimony on the trial the truth of the basic facts upon which the claim of the proponent rests, a verdict may be directed against him, and if the proof is altogether of a documentary nature and the authenticity and correctness of the documents are unquestioned, and if such proof establishes beyond all doubt the truth of facts which as a matter of law entitled the proponent to the relief sought, and such proof is unimpeached and uncontradicted, the proponent will be entitled to a peremptory instruction. This is upon the theory that there is no question of fact left in the case and that upon the questions of law involved the jury has no right to pass. * * *" Rogers v. Thompson, 364 Mo.

605, 265 S.W.2d 282, 287; Prevost v. Wilkin, Mo.App., 358 S.W.2d 417 [1, 2].

Defendant claims the conversion of the airplane was a controverted fact for the jury. If so, plaintiff's position is untenable as we have said the party having the burden is not entitled to a directed finding on a controverted fact issue resting in oral testimony, the credibility of proponent's witnesses being for the jury although his adversary offers no testimony. Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558 [2]; Rogers v. Thompson, supra. The issue calls for a consideration of the record at the close of the evidence. We are in accord with defendant's cited cases holding it is reversible error for an instruction to assume a fact issue that was controverted throughout the trial. Spritz v. St. Louis Pub. Serv. Co., Mo., 341 S.W.2d 790, 793 [1], and cases cited. However, it is not error for an instruction to assume an uncontroverted fact established by the testimony of the proponent and by the testimony of his adversary. Davidson v. St. Louis Transit Co., 211 Mo. 320, 356, 109 S.W. 583, 593; Banks v. Koogler, Mo., 291 S.W. 2d 883, 891 [24]; Siemes v. Englehart, Mo.App., 346 S.W.2d 560, 565 [3, 4].

The conversion occurred in the State of Texas and the parties stress the law of that state.

In Texas and other states: " 'Conversion may consist in the wrongful detention of chattels under an assertion of right inconsistent with the owner's general dominion, particularly when the detention occurs after a demand for possession has been made.' " Alexander Trust Est. v. Lindsey Drug Co., Tex.Civ.App., 214 S.W. 2d 475, 478; Ellis Oil Co. v. Adams, Tex. Civ.App., 109 S.W.2d 1026 [3]. Defendant's dominion over the Lodestar after effecting the purpose of the bailment, FAA certification as airworthy, adverse to plaintiff's rights constituted a conversion. Presley v. Cooper, 155 Tex. 168, 284 S.W.2d 138 [6]; Holland v. Lesesne, Tex.Civ.App., 350 S.W.2d 859, 864 [12, 14]; Fenberg v.

Fenberg, Tex.Civ.App., 307 S.W.2d 139 [3]. The conversion occurred the moment defendant exercised such dominion over the chattel. Holland and Fenberg cases, supra; 89 C.J.S. Trover & Conversion § 61, nn. 75, 76.

Defendant refused the demand of plaintiff's pilots for the return of the Lodestar on December 28th in Fort Worth, he testified, because plaintiff failed to give him a letter waiving all claims (1) account of delays, (2) loss of usage, and (3) an apology for Mr. Sebree's letters to Mr. Jenkins. He admitted plaintiff never consented to any of said conditions. He testified the prior agreement evidenced by long distance conversation and letters, including his letter of October 7th, had never been changed in any way; that he wired and wrote Mr. Curry on December 23rd imposing the above-mentioned conditions, and that said conditions "had nothing to do with our previous arrangements." "Q * * * Now, you knew at that time that Mr. Curry had never agreed or been asked to agree to any of those things, didn't you? A I knew that I had nothing in writing with Mr. Curry that he agreed or had stated that he would accept that letter. Q You had nothing either in writing or verbally? A No."

With defendant admitting plaintiff had never agreed to release him from liability or give him an apology, defendant could not lawfully dictate said additional unilateral conditions as a prerequisite to returning plaintiff's property. Hicks Rubber Co. v. Stacy, Tex.Civ.App., 133 S.W.2d 249 [5] and citation; King v. Kansas City Life Ins. Co., 350 Mo. 75, 164 S.W.2d 458, 467.

Mr. Fender's telegram, see statement, in reply to plaintiff's telegram of December 28th demanding the delivery of the Lodestar, stated the Lodestar was being held under the Texas Mechanics Lien Law, and that upon payment in full for the repairs defendant would release the lien and airplane. The bill, for $13,815.58, reached

plaintiff a day or two later. Plaintiff contends said mechanics lien law is not a defense to Count III for several reasons.

Defendant did not testify that he refused to surrender the Lodestar under said lien law or because he had not been paid. He admitted he never requested or received any authorization over Mr. Curry's signature, which he had agreed to secure, to charge any part of the $13,815.58 against plaintiff. He testified: "Q * * * This is the question: Isn't it true that the work covered by that bill which you sent to Mr. Curry was for the work necessary to meet the FAA requirements which you had by your September and early October correspondence and conversations undertook to do at your own cost? A I answered that question. Q What is the answer? A I said yes."

Defendant could not base a lawful retention of plaintiff's airplane upon a demand for more than plaintiff was obligated to pay defendant. See approved instruction in Caldwell v. Auto Sales & Sup. Co., Tex. Civ.App., 158 S.W. 1030, 1032 [4]. It is not necessary to note additional grounds advanced by plaintiff.

 Defendant claims he put the Lodestar in condition for FAA certification to accommodate plaintiff and there was no consideration for any agreement. There are various definitions of "consideration" as applied to simple contracts. A valuable consideration "may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, loss or responsibility given, suffered or undertaken by the other." McGary v. Campbell, Tex. Civ.App., 245 S.W. 106, 116 [10, 11]; Security Drilling Co. v. Rathke Oil Co., Tex. Civ.App., 41 S.W.2d 1019, 1022. Under the testimony of defendant's witnesses some discrepancies causing the grounding of the Lodestar were chargeable against defendant. Mr. Curry promised and had the Lodestar flown from Gopher Aviation in Minnesota to defendant's Aviation Division in Fort Worth to save on defendant's costs in doing the work. Defendant's witnesses

testified that Mr. Curry was blaming defendant, who told Mr. Curry he could sue. A dispute existed as to defendant's obligation in the circumstances involved. It is well settled that the compromise of a disputed claim is a valuable and sufficient consideration to support a promise. Missouri, K. & T. Ry. Co. v. Edwards, Tex.Civ.App., 176 S.W. 60 [2]; Dempsey Oil Co. v. Hussey, Tex.Civ.App., 254 S.W. 590 [1]; Railroad Comm. of Texas v. Rau, Tex.Civ. App., 45 S.W.2d 413 [16]; 11 Am.Jur., Compromise and Settlement, § 4. Winningham v. Dyo, Tex.Com.App., 48 S.W.2d 600, 604, quotes the following with approval from Sooy v. Winter, 188 Mo.App. 150, 175 S.W. 132, 134 [3]: "'If one makes an executory contract which lacks a consideration, he may avoid it when called upon for performance. But if he chooses to execute the contract by performance, there is nothing to hinder his doing so, and he cannot turn round and seek to undo his voluntary act.'" Dallas Hotel Co. v. Buffington, Tex. Civ.App., 294 S.W. 610 [1].

Defendant's cases holding a failure of consideration constitutes an effectual defense to the enforcement of a contract or a proper ground for rescinding a contract are not in conflict with the foregoing. Stallings v. Moore, Tex.Civ.App., 73 S.W.2d 562; Food Machinery Co. v. Moon, Tex. Civ.App., 165 S.W.2d 773; Shear Co. v. Harrington, Tex.Civ.App., 266 S.W. 554; Nunn v. Lackey, 1 White & W.Civ.Cas.Ct. App. § 1331. Nor has this plaintiff breached any provision of an agreement, express or implied, as in defendant's case of Taylor v. Deseve, 81 Tex. 246, 16 S.W. 1008.

If we assume defendant's offer to fix the airplane was voluntary, defendant might withdraw his help, as he argues. However, Count III is not based on "a withdrawal of a voluntary offer of help." Defendant is asserting the right to convert plaintiff's airplane to his own dominion, claiming possessory interests therein when no such interest was created by agreement, or by operation of law, or by any voluntary offer of assistance.

Conversion is a legal wrong which follows certain facts. 89 C.J.S. Trover & Conversion § 1. The conversion results as a matter of law when the essential facts stand judicially admitted. Defendant admitted: (1) Plaintiff's ownership of the Lodestar. (2) Plaintiff's bailment of said airplane to defendant under an agreement for defendant to secure its certification by the FAA as airworthy. (3) Defendant's completion of the work and the FAA's certification of the airplane as airworthy. (4) Plaintiff's demand for the return of the airplane. (5) Defendant's refusal to surrender possession of the airplane to plaintiff. (6) The absence of any legal justification for defendant's refusal. The judicially admitted facts establish defendant's conversion of the airplane.

Defendant's statement he never agreed to pay for any items which were not his fault or for ordinary wear and tear items and that plaintiff's attorney assumed responsibility for the couch gives consideration only to part and not to the whole of the agreement between plaintiff and defendant. Defendant voluntarily assumed the specific obligation of securing "a direct wire or letter" over Mr. Curry's signature for any work defendant might think plaintiff should pay for in part or whole. Defendant so understood said agreement but never requested an authorization for plaintiff's payment of any item. His letter of December 23rd stated all repairs had been made "without cost to you" and had been "paid for and borne by me." With respect to the couch, Mr. Sebree's letter assuming responsibility for plaintiff for any work on the couch was restricted to work necessitated by modifications made by plaintiff and upon defendant carefully itemizing such work; and the letter stated Mr. Curry did not understand how the work done by plaintiff caused defendant's inferences of difficulty with the seat belts. Defendant never explained to plaintiff how plaintiff's modification of the couch affected the seat belts and defendant never submitted any itemization of the work thus involved to

plaintiff for authorization as defendant had agreed to do.

Defendant also claims instruction "G," supra, is erroneous in that it directed the jury, in addition to the actual damages, to add "interest at the rate of 6% per annum on said amount from December 28, 1960, to the present."

In Texas interest at 6% per annum between the conversion and judgment dates is added to the actual damages for conversion *as a matter of law.* Lloyds America v. El Paso-Hudspeth Counties Road District, Tex.Civ.App., 107 S.W.2d 1008 [3, 13]; Moore v. Barlow, Tex.Civ.App., 352 S.W.2d 804, 806 [5], stating: "Plaintiff calls our attention to his prayer for recovery of interest after conversion and before judgment. On the authority of Texas Company v. State, 154 Tex. 494, 281 S.W.2d 83, plaintiff is entitled to recover interest before judgment. Our judgment is accordingly corrected"; Statler Hotels v. Herbert Rosenthal Jewelry Corp., Tex.Civ.App., 351 S.W.2d 579, 585 [9, 10]. See § 537.520 (RSMo 1959, V.A.M.S.), authorizing the recovery of damages in the nature of interest in trover and conversion cases, which has been considered declaratory of the common law. Lack v. Brecht, 166 Mo. 242, 65 S.W. 976, 980 [4].

Unless we rewrite the contract established by defendant's as well as plaintiff's evidence, which we are not authorized to do, defendant's liability under Count III stands established, and plaintiff was entitled to submit said count under its requested instruction "G."

Instruction No. 11 directed a verdict for defendant on the issue of liability under Count III of plaintiff's petition. Our holding that plaintiff's instruction "G," directing a verdict for plaintiff on said issue of liability as a matter of law, should have been given precludes the submission of said issue under this record to the jury. It is not necessary to develop additional grounds advanced by plaintiff for holding instruction No. 11 should not have been given.

Plaintiff claims error in the refusal of its instruction No. "F," reading in part: "You are instructed that at the time that plaintiff purchased the Lodestar Airplane mentioned in evidence said airplane was not A-1 in every respect, was not in first class condition and was not airworthy." The instruction then informed the jury that a warranty existed if defendant made all or any of said representations for the purpose of inducing plaintiff to purchase if such representation were not true when made, regardless of defendant's knowledge of its truth, if plaintiff relied on such representation in purchasing said Lodestar, etc., and upon such findings the verdict should be for plaintiff on Count I in such an amount as would "compensate plaintiff for such loss of use." Consult Luckel v. De Vor, Tex. Civ.App., 17 S.W.2d 1097 [4]; Naughton Mulgrew Mtr. Car Co. v. Westchester Fish Co., 105 Misc. 595, 173 N.Y.S. 437, 438 [2]; Vetter v. Browne, 231 Mo.App. 1147, 85 S.W.2d 197 [2].

Plaintiff argues that the Lodestar could not lawfully be flown without costly and time consuming repairs attributable in part to defendant's converting it into an executive type plane following defendant's purchase in 1955, and concludes that plaintiff was entitled to have the court instruct that the Lodestar was not "A-1 in every respect, was not in first class condition and was not airworthy" at the time plaintiff purchased. Defendant, to obtain FAA certification of the Lodestar as airworthy in December, 1960, in some instances merely obtained approval of the existing installation, in some instances the modification had to be changed, and in one instance at least defendant's modification was replaced by the original installation. Defendant's witness Keefauver, on cross-examination, testified that the decisions of the FAA are final for those in the aviation business and a FAA finding that discrepancies make an airplane unairworthy is accepted. Plaintiff's expert witness Callaway testified on cross-examination that certification of an aircraft as airworthy by a qualified FAA inspector must be accepted. This Lodestar's log contained certifications of airworthiness after annual inspections in April, 1956; June, 1957; July, 1958, and *September, 1959*. In addition, there was testimony from defendant, from his chief pilot Jenkins, and from his shop manager Bradley, an experienced airplane service and maintenance man, permitting of findings that this Lodestar was airworthy at the time of plaintiff's purchase, February 8, 1960. This record does not establish that FAA certifications as airworthy or unairworthy are infallible and all conclusive. We may not say as a matter of law that the evidence favorable to defendant on this issue should be disregarded as being contrary to known facts and manifestly untrue (Kelly v. Terminal Rd. Ass'n, Mo., 315 S.W. 2d 699, 702 [1]; Paige v. Missouri Pac. Rd. Co., Mo., 323 S.W.2d 753, 759 [8]) as urged by plaintiff. Plaintiff relies upon the testimony favorable to his position; but upon the whole record the fact issues here involved were for the jury and not the court.

Plaintiff questions defendant's instruction No. 10. It directed a verdict for defendant on Count I upon findings "that before the purchase by plaintiff from defendant of the airplane mentioned in evidence plaintiff had an opportunity to inspect said airplane as to its quality, characteristics and suitability and did in fact make such inspection before such purchase and that defendant did not intentionally conceal any material defect, if you find there was such, and that plaintiff did not rely upon representations, if any, made to him by defendant before such sale."

Defendant says the defense submitted by the instruction was "that plaintiff did not rely upon representations, if any, made to him by defendant before such sale" (Turner v. Central Hdwe. Co., 353 Mo. 1182, 186 S.W.2d 603, 608[12], 158 A.L.R. 1402); that the additional findings hypothesized were unnecessary, imposed an added burden on defendant, and plaintiff has no just ground of complaint (Kimbrough v.

Chervitz, 353 Mo. 1154, 186 S.W.2d 461 [17]). The submitted finding "that defendant did not intentionally conceal any material defect, if you find there was such," conveyed to the jury that if plaintiff failed to prove an intentional concealment of a material fact plaintiff could not recover under Count I for breach of express warranty. Decisions of the Supreme Court of Texas and of this court hold positive affirmations of fact made to induce a vendee to purchase constitute warranties regardless of the seller's intention or state of mind. Turner, supra, 186 S.W.2d 603[6, 14]; United States Pipe & Foundry Co. v. City of Waco, 130 Tex. 126, 108 S.W.2d 432, 436 [5]. See Logue v. Hill, 218 Ark. 797, 238 S.W.2d 753[1]. Defendant's position of harmless error does not apply where one of the grounds conjunctively submitted imposes an undue burden on an adversary by an improper statement of the law. Miles v. Gaddy, Mo., 357 S.W.2d 897, 901[3] and citations; Wilson v. Kansas City Pub. Serv. Co., Mo., 291 S.W.2d 110, 117[16–19]. We need not develop other criticisms of the instruction. It should be redrafted.

Following defendant's instructions defendant's Jenkins informed plaintiff's Frazier on December 21st that defendant would let the Lodestar "sit there till the damn wings fell off" unless plaintiff in writing released defendant from liability and apologized for Mr. Sebree's letters to him, Jenkins. Plaintiff claims error in the exclusion of evidence that defendant let the plane sit outside for fifteen months or more without running its engines and the resulting damage to the aircraft. Defendant argues that if he converted the airplane on December 28th his treatment of it thereafter was his business and not plaintiff's. In this case, however, plaintiff seeks exemplary as well as actual damages under its conversion count, Count III.

Davenport v. Midland Bldg. Co., Mo. App., 245 S.W.2d 460, 465, states: "It is settled law in this state that proof of legal malice alone will support a judgment for punitive damages." See also Davis v. Nash Central Motors, Mo.App., 332 S.W.2d 475 [9, 11].

Evidence is considered relevant if the fact it tends to establish tends in turn to prove or disprove a fact in issue, or to corroborate evidence which is relevant and which bears on the principal issue. Federal Sav. & L. Ins. Corp. v. First Nat. Bank (W.D.Mo.), 3 F.R.D. 487 [3, 4]; Luechtefeld v. Marglous, Mo.App., 151 S.W.2d 710, 714[5, 7]; Crowley v. Crowley, Mo.App., 360 S.W.2d 293, 295[2]. Evidence of other acts of defendant than those alleged for which damages are sought, both preceding as well as following the particular acts, is admissible under an issue of exemplary damages if so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed. Peitzman v. City of Illmo, 8 Cir., 141 F.2d 956, 962[20]; Westbrook v. Jefferies, 173 S.C. 178, 175 S. E. 433[1]; Ware v. Cartledge, 24 Ala. 622, 627[3], 60 Am.Dec. 489; Devine v. Rand, 38 Vt. 621, 627; 25 C.J.S. Damages § 159, n. 67; Annotation, 12 A.L.R. 1032.

We hold plaintiff's position well taken.

Other points are presented. No doubt upon a new trial the parties will give consideration to the contentions made on this appeal and the observations herein. In the circumstances we deem it unnecessary to further extend this opinion.

Civil Rule 83.13(c), V.A.M.R., so far as material, provides: "The appellate court shall examine the transcript on appeal and * * * award a new trial or partial new trial, * * * or give such judgment as such [trial] court ought to have given, as to the appellate court shall seem agreeable to law. Unless justice requires otherwise, the court shall dispose finally of the case on appeal and no new trial shall be ordered as to issues in which no error appears." RSMo 1959, § 512.160(3), V.A.M. S. Under the record before us defendant's own testimony established, as did plaintiff's

evidence, plaintiff's case against defendant on the issue of liability under plaintiff's conversion count, Count III. In these circumstances the case under Count III should be remanded for new trial on the issue of damages alone. Cunningham v. Reagan, Mo., 273 S.W.2d 174, 176; Knisely v. Leathe, Mo., 178 S.W. 453, 461[11]; Stone v. Farmington Aviation Corp., 363 Mo. 803, 253 S.W.2d 810, 813[7–10]; Haire v. Stagner, Mo.App., 356 S.W.2d 305, 311[8]; Sachs Steel & S. Co. v. St. Louis Auto Parts & S. Co., Mo.App., 322 S.W.2d 183, 189 [9].

The judgment is reversed and the cause remanded for new trial as to Count I and for new trial on the issue of damages alone under Count III.

PER CURIAM.

The foregoing opinion by BOHLING, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.